Filed 9/28/16  P. v. Capla CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B266329 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA102128) |
| v. | |
| ROBERT ANTHONY CAPLA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Mike Camacho, Judge.  Affirmed.

Juliana Drous, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Robert Anthony Capla (defendant) appeals from the judgment entered after he was convicted of two counts of attempted murder. Defendant contends: that the trial court erred in failing to instruct the jury that one of the prosecution witnesses was an accomplice as a matter of law; that there was no substantial evidence that defendant intended to kill everyone in a "kill zone"; and that trial counsel rendered ineffective assistance by failing to seek to suppress cell phone evidence. Finding no merit to defendant's contentions, we affirm the judgment.

## BACKGROUND

Defendant and two codefendants, Ronald Diaz (Diaz) and Melissa Sanchez (Sanchez), were charged in a first amended information with two counts of attempted murder in violation of Penal Code sections 187 and 664 (counts 1 and 2).[1] The amended information alleged as to both counts that the attempted murders were committed willfully, deliberately, and with premeditation within the meaning of section 664, subdivision (a), and for the benefit of, at the direction of, or in association with a criminal street gang within the meaning of section 186.22, subdivision (b)(4). It was further alleged, pursuant to Penal Code section 12022.53, subdivisions (c), (d), and (e)(1), that in the commission of the offenses, defendant and a principal personally and intentionally discharged a firearm, and that defendant personally and intentionally discharged a firearm causing great bodily injury to Juan Gallardo (Gallardo).

Defendant and Diaz were tried together by separate juries, and Sanchez's matter was settled prior to trial with a plea agreement. Defendant was convicted of both counts as charged and the special allegations were found true. The trial court sentenced defendant to a total prison term of 80 years to life, comprised of consecutive terms as to each count of 15 years to life, plus 25 years to life due to the firearm enhancement under section 12022.53, subdivision (d). The trial court imposed and stayed the remaining firearm enhancements.

Defendant filed a timely notice of appeal from the judgment.

---

[1] All further statutory references are to the Penal Code unless indicated otherwise.

2

**Prosecution evidence**

Late in the evening of March 28, 2013, Sanchez, her boyfriend Juan Jaime (Jaime) and his cousin Gallardo, sat in her car in the driveway of Jaime's house for about an hour, eating and smoking marijuana. Sanchez saw a car slowly pass by around 11:40 p.m., and then circle around twice before stopping in the street near Jaime's driveway. She saw defendant in the passenger seat, but did not recognize the driver. She observed the defendant and the driver get out of the car just as Jaime and Gallardo got out of Sanchez's car to throw away some trash. Sanchez saw the driver with a handgun and defendant with a rifle. Holding the rifle in both hands, defendant steadied it on the car door. Sanchez then heard multiple gunshots in rapid succession, about 10 gunshots in all. Jaime testified that upon hearing the gunshots, he ran and ducked behind his mother's car, which was one of two other cars parked in the driveway closer to the house. He escaped injury. Sanchez ducked down under the dashboard of her car until the shooting stopped, and also escaped injury. Gallardo was struck by bullets, suffering a wound to the lung and another close to his heart. He survived and also testified at trial.[2]

Jaime was a member of the Duff Street clique of the Puente 13 gang, Gallardo was a member of the Happy Homes clique of the Puente 13 gang, and defendant was a member of the Blackwood clique of the Puente 13 gang. Blackwood, a criminal street gang clique was "at war" with all the other cliques of the Puente 13 gang, and engaged in violent feuds which sometimes involved physical assaults and shootings. Defendant was known as "Malo," and wore a tattoo on his upper lip that spelled out "Blackwood."

Los Angeles County Deputy Sheriff Irma Chavez arrived at the scene of the shooting, and after speaking to Jaime she investigated the area of the driveway and adjacent street. She inspected the Honda and a Scion parked in the driveway, a Ford

---

[2]    Jaime and Gallardo were reluctant witnesses. Jaime claimed that the shooters were two unknown "black dudes," and that he had never before seen defendant, despite having identified defendant at the preliminary hearing and having testified to knowing him from school. Gallardo claimed that he remembered nothing from that night except that he was shot, and he denied that he testified at the preliminary hearing. The trial court took judicial notice that Gallardo had been a witness at the preliminary hearing.

truck parked in the street, and Sanchez's Toyota Camry, which had been moved prior to the deputy's arrival. There were bullet holes in all four vehicles, and bullet damage on the front gate, fence, and pillars of the residence. The bullet holes had not been there before the shooting. Deputy Chavez observed seven .22-millimeter bullet casings and eight .9-millimeter casings. A firearms expert determined that the location where the .22-caliber casings were found was consistent with the bullets having been fired while the shooter was standing in the street.

In her initial discussion with the deputies, Sanchez had intentionally misidentified the shooter in a six-pack photographic lineup, and no witness had yet mentioned defendant or Diaz. Investigators had no information that defendant was involved in the shooting.

On April 10, 2013, primary investigating officer Detective Shawn O'Donnell went with Detective Marquez to serve a search warrant in an unrelated matter. As Detective O'Donnell approached front door of apartment No. 204, Detective Marquez radioed him that someone had jumped out of a second story window at the rear of the building, causing Detective O'Donnell to go to that area where he found Detective Marquez detaining defendant. Detective O'Donnell then went back to apartment No. 204, knocked, and was given permission to search by the occupants who opened the door. Inside he found three firearms, including a .22-caliber semiautomatic rifle and a .380-caliber handgun in the south bedroom. There were indications that this was defendant's bedroom and the room from which defendant had jumped. Defendant was arrested, and a cell phone was recovered from his pocket. After defendant waived his *Miranda*[3] warnings, he admitted owning the guns found in the apartment. Defendant's guns were later test fired, and it was determined that the .22-calibur cartridge casings recovered from the scene had all been fired from his .22-calibur semiautomatic rifle.

All telephone calls made by jail inmates are recorded by a computer system. In a recorded jail conversation between defendant and Lorraine Tovlin the day after his arrest,

---

[3]     *Miranda v. Arizona* (1966) 384 U.S. 436.

4

defendant told Tovlin, "I'm fucked." He explained that the police had three witnesses who could identify him, and that he would be charged with three attempted murders. Defendant added that he had provided probable cause by jumping out of the window, and that ballistics tests would be done on the firearms, adding, "It's all bad." Tovlin, who referred to defendant as "Malo," advised him to grow his mustache so that his tattoo would not show. Tovlin also advised defendant to have his mother pick up his property or the police would use his phone as evidence. Defendant replied, "[F]uck."

Sanchez testified that she and Jaime had been dating for several weeks and had known each other in high school. She had dated defendant before Jaime and claimed that she was still in love with defendant. Although their relationship ended in February 2013, the month before the shooting, she was still in communication with defendant in March and wanted them to get back together. Even after the shooting, she tried to protect him. Sanchez falsely identified someone in a photographic lineup and misled detectives until June, when they told her that defendant's phone records contained her text messages, and they knew that there had been three calls between defendant's and Sanchez's phones between 11:39 and 11:40 p.m. the night of the shooting.[4]

Sanchez submitted to an interview on June 4, 2013, during which she admitted knowing that defendant was the shooter and that he had admitted as much in text messages. Sanchez identified defendant's photograph from a photographic lineup, and wrote: "I saw Robert with a big gun, passenger's side with the door . . . open shooting at Juan Jaime, Juan Gallardo and myself." At trial, Sanchez denied knowing anything about what might have happened that night or knowing beforehand that defendant was going to do something to Jaime, and she denied having spoken to defendant about robbing Jaime. However, Sanchez admitted having told detectives that she had known that defendant planned to rob Jaime and do "what he did" to Jaime. She told them that approximately one week before the shooting they had discussed a signal. Defendant would call, and if

---

[4]     All three calls were connected to a cell tower within one-half mile from the scene of the shooting, which was consistent with defendant's phone being in the vicinity of the shooting.

5

she did not answer, it meant that she was with Jaime; if she did pick up, it meant she was at home and not with Jaime. When the detective asked why she would do this, Sanchez answered, "Because I didn't think he was going to shoot anybody. A robbing you get over it, whatever. I robbed you, you robbed him. Okay. Whatever. But shooting somebody -- like, shooting somebody -- Juan almost died. The cousin almost died in my lap. Like, gasping, like, I was holding him. I was fucking holding him."

At 4:49 a.m., after the shooting, Sanchez sent defendant the following text message: "You're a piece of shit shooting at me. What the fuck is your problem? . . . You fuckin' know my car. Why the fuck would you shoot at me?" Defendant replied, "Wait. I'm lost. When did I shoot at you?" After several more exchanges, Sanchez texted: "Be glad you didn't hit me because that shit was all bad. Worst part is I knew it was you and seen your face." Defendant replied, "I know. But I didn't fuckin' know it was your car. How many times do I have to tell you?" About two weeks later, Sanchez texted: "Please don't do anything to him," referring to Jaime. Defendant replied: "We're going to stop talking about your dream, and I can't promise you anything for him. He robbed my house when I was busted a couple of years back and took my [aunt's] car."

Sanchez was eventually arrested and became a codefendant in this case. During the preliminary hearing, she was transported to court on the same jail bus as defendant and Diaz. Defendant told her she had said the wrong things. Defendant called her a "bitch" and Diaz called her a "snitch." Prior to trial, she entered a guilty plea to attempted robbery, admitted the gang allegation, and received a 13-year suspended sentence.

In her trial testimony, Sanchez alternated between her denial that she knew beforehand that defendant was going to do something to Jaime or that defendant had spoken about robbing Jaime, with testimony that she believed defendant was going to rob Jaime, and that the discussion about robbing Jaime for revenge came after the shooting, but she was not sure. Sanchez denied having planned a robbery with anyone or that she had a deal, plan, agreement, signal, or any special secret message with defendant that night. She claimed she did not answer her phone the first time defendant called because

6

it was silenced, and that she answered the second time because she saw it light up, but then hung up without talking, because she was about to drive. She did not remember a third call. She did not know that a shooting was going to occur. Sanchez claimed that she was a victim and thought defendant was trying to kill her, but pled guilty to attempted robbery because she wanted to go home, having already spent 10 months in custody. Sanchez denied that her plea agreement included testifying. She was surprised when she received a subpoena, because she thought her involvement had ended.

In response to a hypothetical question mirroring the facts in evidence, gang expert Detective Joseph Sumner gave his opinion that the crimes were committed for the benefit of the Blackwood clique of the Puente 13 criminal street gang, as shooting at rivals benefitted the gang by eliminating enemies, gaining respect, and bolstering its reputation. The shooter in such a scenario could expect to gain status within the gang, which would help him to "move up the ranks."

## DISCUSSION

### I. Accomplice Instruction

Defendant contends that the trial court erred by failing to instruct the jury with CALCRIM No. 335, that Sanchez was an accomplice as a matter of law, and instead giving CALCRIM No. 334, which charged the jury with deciding whether she was an accomplice.[5]

"A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (§ 1111.) "'[W]hen there is sufficient evidence that a witness is an accomplice, the trial court is required on its own motion to instruct the jury on the principles governing the law of accomplices,' including

---

[5] The court first instructed the jury that "except for the testimony of Melissa Sanchez, which would require supporting evidence in the event you determine her to be an accomplice, the testimony of only one witness can prove any fact." (CALCRIM No. 301.)

7

the need for corroboration.  [Citations.]" (*People v. Tobias* (2001) 25 Cal.4th 327, 331.) "Whether a person is an accomplice is a question of fact for the jury unless there is no dispute as to either the facts or the inferences to be drawn therefrom.  [Citation.]  The burden is on the defendant to prove by a preponderance of the evidence that a witness is an accomplice.  [Citation.]" (*People v. Fauber* (1992) 2 Cal.4th 792, 834.)  "'[A] court can decide as a matter of law whether a witness is or is not an accomplice only when the facts regarding the witness's criminal culpability are "clear and undisputed."' [Citation.]" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 430.)

"[A]n accomplice is 'one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given' [and who has] '"guilty knowledge and intent with regard to the commission of the crime."'  [Citations.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 302.)  "'"'[A]n accomplice is one who aids or promotes the perpetrator's crime with knowledge of the perpetrator's unlawful purpose *and* an intent to assist in the commission of the target crime . . . .". . . [Citation.]' [Citation.]" (*Bryant, supra*, 60 Cal.4th at p. 429.)

Defendant first contends that there can be no real dispute over whether Sanchez was an accomplice, as she was initially charged with the same crimes as defendant and was held to answer on the same charges after a preliminary examination.  As respondent notes, having been initially charged with the same crime, or even held to answer or convicted of the same crime, does not establish as a matter of law that a codefendant is an accomplice. (*Bryant, supra*, 60 Cal.4th at p. 431.)  While defendant acknowledges the holding of *Bryant*, he argues that such facts are at least relevant to the issue.  In addition, defendant claims that there was no dispute that Sanchez was aware that Jaime was to be assaulted in order to commit a robbery, and attempted murder could have been the foreseeable result.

It was not, in fact, undisputed that Sanchez was aware that defendant intended to shoot or rob Jaime.  Sanchez gave conflicting statements to the detectives about knowing of the plan to rob Jaime and to do "what he did" to Jaime, but then told them:  "I didn't

8

think he was going to shoot anybody. A robbing you get over it, whatever. I robbed you, you robbed him." At trial, Sanchez denied having any advanced knowledge that defendant was going to do something to Jaime or that defendant had spoken about robbing Jaime. She denied having planned a robbery or a signal, and she denied knowing that a shooting was going to occur. Accomplice status cannot be determined as a matter of law upon conflicting evidence and inferences, or upon the credibility of the alleged accomplice's denial. (*People v. Hayes* (1999) 21 Cal.4th 1211, 1271-1272.) Moreover, knowing of an impending unarmed assault does not necessarily compel a finding that the use of a deadly weapon was reasonably foreseeable. (See *People v. Butts* (1965) 236 Cal.App.2d 817, 836-837; *People v. Prettyman* (1996) 14 Cal.4th 248, 262-263.) As it was the jury's task to resolve such conflicts and credibility issues, the trial court did not err.

In any event, error in failing to instruct on accomplice liability is harmless where there is sufficient corroborating evidence in the record. (*People v. Lewis* (2001) 26 Cal.4th 334, 370.) "Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense. [Citations.]" (*People v. Hayes, supra*, 21 Cal.4th at p. 1271.) The evidence is "sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth. [Citation.]" (*People v. Fauber, supra*, 2 Cal.4th at p. 834.) The corroborating evidence against defendant was more than slight. All the .22-calibur cartridge casings recovered from the scene of the shooting were fired from defendant's .22-calibur semiautomatic rifle. Defendant displayed a consciousness of guilt when he jumped out of his bedroom window as sheriff's deputies arrived. (See *People v. Mason* (1991) 52 Cal.3d 909, 941-942.) In his recorded jailhouse conversation defendant admitted that his attempt to flee provided probable cause to arrest him, and that ballistics tests would be incriminating. Just hours after the shooting, in response to Sanchez's texted accusation and claim that she had seen him shooting, defendant texted the reply: "I know. But I didn't fuckin' know it was your car. How many times do I

9

have to tell you?"  Defendant's own actions and admissions provided ample corroborating evidence.

## II.  Substantial evidence of intent to kill

Defendant contends that there was insufficient evidence of an intent to kill to support his conviction of the attempted murder of Gallardo.  In particular, defendant complains that there was no substantial evidence that defendant intended to kill everyone in a "kill zone" surrounding Jaime.

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.)  "The same standard applies when the conviction rests primarily on circumstantial evidence.  [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)  "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence.  [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 396.)  Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'  [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331 (*Bolin*).)  As we begin with the presumption that the evidence was sufficient to support the jury's finding of guilt, it is defendant's burden to affirmatively demonstrate otherwise.  (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1430.)

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.  [Citations.]" (*People v. Lee* (2003) 31 Cal.4th 613, 623-624.)  "'[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may . . . be inferred from the defendant's acts and the circumstances of the crime.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 701.)

10

The kill zone "theory addresses the question of whether a defendant charged with the murder or attempted murder of an intended target can *also* be convicted of attempting to murder other, nontargeted, persons." (*People v. Stone* (2009) 46 Cal.4th 131, 138.) "[A]lthough the intent to kill a primary target does not *transfer* to a [nontargeted] survivor, the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within what [is] termed the 'kill zone.'" (*People v. Bland* (2002) 28 Cal.4th 313, 329.) Thus, a concurrent intent to kill nontargeted victims may be inferred when the defendant uses lethal force calculated to kill everyone within an area around the intended target as a means of ensuring the target's death. (*Ibid.*)

Under defendant's view of the evidence, Jaime was the only target, not Gallardo or Sanchez, because there was evidence that with a motive to rob Jaime, defendant circled the block while Jaime, Gallardo, and Sanchez remained in the car, and did not start shooting until Jaime got out of the car. Defendant then surmises that Gallardo was hit by defendant's gunfire only because he coincidentally got out of the car at the same time as Jaime, and because defendant must have lacked skill with the firearm. From such circumstances defendant appears to reason that because the doctrine of transferred intent does not apply to attempted murder, the prosecution was required to present evidence that defendant intended to kill Jaime by killing all those near him, i.e., Gallardo and Sanchez. Defendant then concludes that intent to kill could not be based on such a "kill zone" theory because "[o]ther than the fact [defendant] fired several shots, there was no evidence whatsoever that he intended to kill *everyone* in the area." (Italics added.)

Initially, we reject the underlying assumption in defendant's argument that because a "kill zone" theory was before the jury, the prosecution was required to prove that defendant harbored an intent to kill Gallardo under that theory alone. The trial court instructed the jury with CALCRIM No. 600, which defines attempted murder, with the following optional language regarding the kill zone theory of concurrent intent:

> "[A] person may intend to kill a specific victim or victims and, at the
> same time, intend to kill everyone within a particular zone of harm, what

11

we call 'kill zone.' In order to convict [the] defendant of the attempted murder of Juan Gallardo, the People must prove that the defendant not only intended to kill Juan Jaime but also *either* intended to kill Juan Gallardo *or* intended to kill everyone within that kill zone. If you have a reasonable doubt whether the defendant intended to kill Juan Gallardo, or intended to kill Juan Jaime by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Juan Gallardo." (Italics added.)

The jury was thus given the option of inferring that defendant intended to kill everyone within the kill zone, but it was also told it was not required to do so. As read by the trial court, CALCRIM No. 600 correctly stated the elements of the offense of attempted murder, as well as the kill zone theory of concurrent intent. (*People v. Stone, supra*, 46 Cal.4th at pp. 137-138 & fn. 3; *People v. Campos* (2007) 156 Cal.App.4th 1228, 1241, 1243.) Contrary to defendant's apparent reasoning, the term "kill zone" is merely shorthand for concurrent intent; it is not a special legal doctrine such as the doctrine of transferred intent. (*People v. Bland, supra*, 28 Cal.4th at p. 331, fn. 6.) "Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others." (*Ibid.*) As defendant does not contend that the instruction was erroneous, his premise that the prosecution was limited to that theory is without merit.

Regardless, defendant's view of the evidence does not demonstrate a lack of substantial evidence to support a kill zone theory, as it consisted of speculative conclusions drawn in favor of defendant's of argument. Defendant does not meet his burden merely by summarizing the circumstances that support a finding in his favor without also showing that the jury's contrary finding cannot reasonably be inferred from the evidence. (*People v. Kraft, supra*, 23 Cal.4th at pp. 1053-1054.) The substantial evidence test "is not whether the evidence may be reconciled with innocence, but whether there is substantial evidence in the record on appeal to warrant the inference of guilt drawn by the [jury]. [Citation.]" (*People v. Saterfield* (1967) 65 Cal.2d 752, 759.)

12

Viewed in the light most favorable to the jury's finding of guilt, substantial evidence supported a reasonable inference that defendant intended to kill everyone in Jaime's proximity. There were bullet holes in Sanchez's car, as well as in the nearby car used by Jaime to hide behind. Also, bullets struck Gallardo as he got out of Sanchez's car. When, as here, a gang member fires multiple shots at a group of people in rival gang territory it is reasonable to infer that he harbored an intent to kill someone. (See *People v. Francisco* (1994) 22 Cal.App.4th 1180, 1192.) Further, firing multiple shots directly at a small group at close range as defendant did, will give rise to a reasonable inference that the shooter intended to kill all in the group. (*People v. Garcia* (2012) 204 Cal.App.4th 542, 554.) A shooter who directs lethal force at a group of people in close proximity as defendant did here, "can be convicted of several attempted murders if he intended to kill several people, even if there were no particular people he intended to kill. [Citation.]" (*People v. McCloud* (2012) 211 Cal.App.4th 788, 798-799; see also *People v. Houston* (2012) 54 Cal.4th 1186, 1218.)

Moreover, substantial evidence supports a finding that defendant specifically targeted Gallardo with the intent to kill. A "shooter's purposeful 'use of a lethal weapon with lethal force' against the victim, if otherwise legally unexcused, will itself give rise to an inference of intent to kill. [Citation.]" (*People v. Smith* (2005) 37 Cal.4th 733, 742.) The inference arises even where no motive is apparent and the victim survives. (*Ibid*.) As defendant acknowledges here, he did not fire wildly, but rather rested his gun on the car door, took aim, and fired several shots which struck only Gallardo. Gallardo was struck twice, in the lung and near his heart. From such circumstances, the jury could reasonably conclude that defendant specifically intended to kill Gallardo and thus intentionally targeted him.

We conclude that there was substantial evidence to support a finding that defendant intended to kill Gallardo by means that would kill all three people in and near Sanchez's car or by specifically targeting Gallardo with the intent to kill him.

13

### III.  Cell phone evidence

Defendant contends that his trial counsel rendered ineffective assistance by failing to move to suppress text messages and cell site location records from defendant's cell phone, which he claims were obtained without a warrant.

The Sixth Amendment right to assistance of counsel includes the right to the effective assistance of counsel.  (*Strickland v. Washington* (1984) 466 U.S. 668, 686-674; see also Cal. Const., art. I, § 15.)  "Generally, a conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes *both* of the following:  (1) that counsel's representation fell below an objective standard of reasonableness; *and* (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. [Citations.]  If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails."  (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.)

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  (*Strickland v. Washington*, *supra*, 466 U.S. at p. 690.)  "'Tactical errors are generally not deemed reversible; and counsel's decisionmaking must be evaluated in the context of the available facts.  [Citation.]  To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . ."  [Citation.]'  [Citations.]"  (*People v. Hart* (1999) 20 Cal.4th 546, 623-624.)

Respondent points out that at the time defendant's cell phone and records were obtained in mid-2013, California Supreme Court precedent was that a warrantless search of a cell phone found on the defendant's person at the time of arrest was valid.  (*People v. Diaz* (2011) 51 Cal.4th 84, 93 (*Diaz*).)  It was not until the following year that the United States Supreme Court held otherwise.  (See *Riley v. California* (2014) ___ U.S. ___ [134 S.Ct. 2473, 2485, 2493].)  Respondent contends that because the trial court was bound by

*Diaz* (see *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), it would most certainly have denied a motion to suppress. "The Sixth Amendment does not require counsel to raise futile motions. [Citations.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 843, fn. 24.) Defendant counters that *Diaz* does not apply because the cell phone was not searched incident to his arrest, but rather, the following day. However, *Diaz* held that there was no Fourth Amendment requirement that the cell phone search be contemporaneous with the arrest, so long as it was immediately associated with the defendant's person at the time of arrest. (*Diaz, supra*, 51 Cal.4th at p. 93.) Thus, this ground would have been rejected as well.

Defendant argues that the motion would have had merit with regard to the cell tower location data, based upon *U.S. v. Jones* (2012) 565 U.S. __ [132 S.Ct. 945], which was published prior to defendant's arrest. In that case, the United States Supreme Court held that attaching a GPS device to monitor the movements of defendant's vehicle on public streets, constituted a search within meaning of the Fourth Amendment. (*Id*. at pp. 948-949.) However, the court did not address the circumstances under which such a search would be unlawful or a warrant would be required. As defendant points out, Justice Alito commented that absent "statutes regulating the use of GPS tracking technology for law enforcement purposes[,] [t]he best that we can do [is] to ask whether the use of GPS tracking in a *particular case* involved a degree of intrusion that a reasonable person would not have anticipated." (*Id*. at p. 964 (conc. opn. of Alito, J.), italics added.)

In this particular case, the record is silent regarding the circumstances under which the cell tower location information was obtained, despite defendant's speculation that the search of his phone was "plainly done without a warrant." Joseph Sierra, custodian of records for T-Mobile and Metro PCS, testified that he searched the records for the cell phones registered to defendant and Sanchez, and produced the call records relating to the "search date," meaning the date range required by legal demand served on the company. Neither the kind of legal demand nor the basis for it appears in the record. "'We cannot

15

evaluate alleged deficiencies in counsel's representation solely on defendant's unsubstantiated speculation.' [Citations.]" (*Bolin, supra*, 18 Cal.4th at p. 334.)

In sum, the record on appeal fails to disclose why counsel did not seek to suppress defendant's cell phone records, and any circumstances which might demonstrate deficient performance by counsel do not appear in this record. As a satisfactory explanation appears to lie in the state of binding precedent at the time of trial, defendant has failed to show that counsel failed in the "exercise of reasonable professional judgment." (*Strickland v. Washington, supra*, 466 U.S. at p. 690; see *People v. Hart, supra*, 20 Cal.4th at pp. 623-624.)

Moreover, we agree with respondent that defendant has not met his burden to show prejudice by demonstrating a reasonable probability that, but for the alleged error, defendant would have obtained a different result. (*Strickland v. Washington, supra*, 466 U.S. at p. 694; *People v. Rodrigues, supra*, 8 Cal.4th at p. 1126.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.) Defendant's only argument relating to prejudice is that the cell site location records had a prejudicial impact because they established he was near the scene of the shooting at the time it occurred, and corroborated Sanchez's identification of defendant as the shooter. Defendant does not attempt to show how confidence in the outcome would be undermined without the records; nor does defendant mention the inculpatory evidence that would remain in evidence against him.

The inculpatory evidence that would remain after a successful suppression motion would inclue the following: the .22-calibur semiautomatic rifle used in the shooting and found in defendant's bedroom; the seven cartridge casings recovered from the scene, all fired from that rifle; defendant's admission that he owned the rifle; defendant's attempt to flee law enforcement by jumping through his bedroom window; defendant's recorded jail telephone conversation in which he admitted that his attempt to flee provided probable cause to arrest him, and that ballistics tests and his cell phone would be incriminating. Also remaining would be defendant's motive, as a member of the Blackwood clique of the Puente 13 criminal street gang, to attempt to kill Jaime and Gallardo. As the gang

16

expert testified, defendant's gang was "at war" with other Puente 13 cliques, the victims here were members of other cliques, and as the shooter, defendant stood to benefit his gang and elevate his status in the gang by shooting at rivals. Considering all the circumstances, we discern no reasonable probability that absent the cell phone evidence defendant would have obtained a different result.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
HOFFSTADT

17